*25 MICHAEL J. GABLEMAN, J.
¶ 1. These cases arise from a John Doe proceeding originally initiated in Milwaukee County, and subsequently expanded to four additional counties, Iowa County, Dodge County, Dane County, and Columbia County. Though not consolidated, these proceedings have been overseen by a single John Doe judge and organized by a single special prosecutor (Francis Schmitz). For the sake of clarity, we will refer to all five proceedings as a single "John Doe investigation." The investigation has been ongoing for several years and has been the subject of much litigation.[1]
¶ 2. According to the special prosecutor, the purpose of the John Doe investigation is to root out *26 allegedly illegal campaign coordination between certain issue advocacy groups and a candidate for elective office. To further the investigation, the special prosecutor sought, and received, wide-ranging subpoenas and search warrants for 29 organizations and individuals, seeking millions of documents that had been created over a period of several years. Various targets (collectively "the Unnamed Movants") moved the John Doe judge to quash the subpoenas and search warrants and to return any property seized by the special prosecutor. The John Doe judge, the Hon. Gregory A. Peterson, presiding, granted the motions to quash and ordered the return of all property seized. Reserve Judge Peterson stayed the order, however, and also halted the John Doe investigation pending our resolution of the cases before us.
¶ 3. The first case we address is an original action brought by Unnamed Movants Nos. 6 and 7, State ex rel. Two Unnamed Petitioners v. Peterson ("Two Unnamed Petitioners"). Unnamed Movants Nos. 6 and 7 seek a declaration of rights that the special prosecutor's theory of the case is invalid under Wisconsin law. Specifically, they ask that we declare that coordinated issue advocacy of the kind alleged by the special prosecutor is not regulated under Wis. Stat. Ch. 11 (2011-12),[2] Wisconsin's campaign finance law.
¶ 4. The second case we review is a petition brought by the special prosecutor for a supervisory writ and an appeal of Reserve Judge Peterson's decision and order quashing the subpoenas and search *27 warrants, State ex rel. Schmitz v. Peterson ("Schmitz v. Peterson"). The special prosecutor argues that Reserve Judge Peterson improperly quashed the subpoenas and search warrants because the records in the John Doe investigation establish a reasonable belief that the Unnamed Movants violated Wisconsin's campaign finance law. This case is before us on the Unnamed Movants' petitions to bypass the court of appeals pursuant to Wis. Stat. § 809.60 (2013-14).
¶ 5. The third case we address is a petition for a supervisory writ and a review of a decision of the court of appeals, State ex rel. Three Unnamed Petitioners v. Peterson ("Three Unnamed Petitioners"). This petition for supervisory writ was brought by Unnamed Movants Nos. 2, 6, and 7, and broadly challenges whether the John Doe investigation can be initiated in five separate counties under a single John Doe judge, and whether the special prosecutor was properly appointed. The court of appeals denied the supervisory writ and Unnamed Movants Nos. 2, 6, and 7 appealed that decision to this court.
¶ 6. Our order granting and consolidating[3] each of these cases identified 14 issues presented by the complex nature of the cases. These issues related to the procedural nature of the John Doe investigation, as well as whether the conduct alleged by the special prosecutor is actually a violation of Ch. 11. Subsequent briefing by the parties has revealed that the cases can be resolved on much narrower grounds than those that were originally submitted, and we have written this opinion accordingly.
*28 ¶ 7. We can resolve the original action, Two Unnamed Petitioners, by first examining whether the statutory definitions of "committee," "contributions," "disbursements," and "political purposes" in Wis. Stat. §§ 11.01(4), (6), (7), and (16) are limited to express advocacy[4] or whether they encompass the conduct of coordination between a candidate or a campaign committee and an independent organization that engages in issue advocacy. Second, if the definitions extend to issue advocacy coordination, what then constitutes prohibited "coordination?"[5]
¶ 8. Next, we can resolve the supervisory writ petition in Schmitz v. Peterson by answering whether the evidence gathered in the John Doe proceedings provides a reasonable belief that Wisconsin law was violated by a campaign committee's coordination with independent advocacy organizations that engaged in express advocacy.[6]
¶ 9. Finally, we can resolve the supervisory writ petition in Three Unnamed Petitioners by examining: (1) Whether the Director of State Courts ("Director") violated a plain legal duty in appointing reserve judge, Barbara A. Kluka, as the John Doe judge to preside over a multi-county John Doe proceeding; (2) Whether the Chief Judge of the First Judicial District violated a plain legal duty in appointing reserve judge, Gregory A. Peterson, as the John Doe judge to preside over a multi-county John Doe proceeding; (3) Whether a John *29 Doe judge violated a plain legal duty by convening a John Doe proceeding over multiple counties, which is then coordinated by the district attorney of one of the counties; (4) Whether a John Doe judge violated a plain legal duty by appointing a special prosecutor to perform the functions of a district attorney in multiple counties in a John Doe proceeding when (a) the district attorney in each county requests the appointment; (b) but none of the nine grounds for appointing a special prosecutor under Wis. Stat. § 978.045(lr) apply; (c) no charges have yet been issued; (d) the district attorney in each county has not refused to continue the investigation or prosecution of any potential charge; and (e) no certification that no other prosecutorial unit was able to do the work for which the special prosecutor was sought was made to the Department of Administration; and (5) If, arguendo, there was a defect in the appointment of the special prosecutor in the John Doe proceedings at issue in these matters, what effect, if any, would such a defect have on the competency of the special prosecutor to conduct the investigation; or the competency of the John Doe judge to conduct these proceedings?[7]
I. HOLDINGS
A.
¶ 10. In Two Unnamed Petitioners, we hold that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague under the First Amendment to the United States Constitution and Article 1, Section 3 of the Wisconsin *30 Constitution[8] because its language " 'is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate.'" State v. Janssen, 219 Wis. 2d 362, 374, 580 N.W.2d 260 (1998) (quoting Bachowski v. Salamone, 139 Wis. 2d 397, 411, 407 N.W.2d 533 (1987)). However, a readily available limiting construction exists that we will apply and that will prevent the chilling of otherwise protected speech; namely, "political purposes" is limited to express advocacy and its functional equivalent[9] as those terms are defined in Buckley v. Valeo, 424 U.S. 1 (1976), and Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449 (2007) (WRTL II). With this limiting construction in place, Chapter 11 does not proscribe any of the alleged conduct of any of the Unnamed Movants. The special prosecutor has not alleged any express advocacy, and issue advocacy, whether coordinated or not, is "beyond the reach of [Ch. 11]." Wis. Right to Life, Inc. v. Barland, 751 F.3d 804, 815 (7th Cir. 2014) (Borland II). Accordingly, we invalidate the special prosecutor's theory of the case, and we grant the relief requested by the Unnamed Movants.
*31 ¶ 11. To be clear, this conclusion ends the John Doe investigation because the special prosecutor's legal theory is unsupported in either reason or law. Consequently, the investigation is closed. Consistent with our decision and the order entered by Reserve Judge Peterson, we order that the special prosecutor and the district attorneys involved in this investigation must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the investigation. All Unnamed Movants are relieved of any duty to cooperate further with the investigation.
B.
¶ 12. In Schmitz v. Peterson, we hold that the special prosecutor has failed to prove that Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all property seized by the special prosecutor. In quashing the subpoenas and search warrants, Reserve Judge Peterson exercised his discretion under the John Doe statute, Wis. Stat. § 968.26, to determine the extent of the investigation. Because the purpose of a supervisory writ does not include review of a judge's discretionary acts, State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶ 24, 271 Wis. 2d 633, 681 N.W.2d 110, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.
C.
¶ 13. Finally, in Three Unnamed Petitioners, we hold that the Unnamed Movants have failed to prove *32 that either Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor. Although the circumstances surrounding the formation of the John Doe investigation raise serious concerns, and although the appointment of the special prosecutor may well have been improper, such concerns do not satisfy the stringent preconditions for a supervisory writ.[10] Put another way, were we to grant the supervisory writ in this case, we would risk "transform [ing] the writ into an all-purpose alternative to the appellate review process," which we cannot do. Id. Accordingly, we deny the supervisory writ and affirm the decision of the court of appeals.
II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[11]
[12]
¶ 14. In the spring of 2010, a John Doe proceeding (John Doe I) was commenced for the purpose of investigating the alleged misuse of public resources in *33 the Milwaukee County Executive's Office. This investigation resulted in criminal charges being filed against four individuals — Tim Russell, Kevin Kavanaugh, Kelly Rindfleisch, and Darlene Wink — in January 2012.[13]
¶ 15. John Doe I also triggered a second John Doe proceeding (John Doe II), the investigation at issue here. On August 10, 2012, Milwaukee County Assistant District Attorney David Robles filed a petition for the commencement of John Doe II in the Milwaukee County circuit court. This petition sought leave to investigate alleged campaign finance violations under Wis. Stat. Ch. 11, and requested a secrecy order to cover the investigation in anticipation that documents would be sought from the targeted individuals. In support of his request, Robles' petition referred to an affidavit by Investigator Robert Stelter.
¶ 16. Stelter's affidavit indicates that emails obtained in response to a search warrant in John Doe I suggested that there may have been coordination of fundraising between campaign committees and other related, independent groups. Reserve Judge Neal Nettesheim, the John Doe I judge, authorized the use of the information obtained in John Doe I for the purpose of requesting the commencement of John Doe II.
*34 ¶ 17. On August 23, 2012, the Chief Judge of the First Judicial District, Jeffrey Kremers, assigned and forwarded the John Doe petition to Reserve Judge Kluka. On September 5, 2012, using a form titled "Application and Order for Specific Judicial Assignment," Director of State Courts John Voelker (with then-Chief Justice Shirley Abrahamson's name directly above)[14] assigned Reserve Judge Kluka to preside over the John Doe proceeding in Milwaukee County. That same day, Reserve Judge Kluka authorized the commencement of the John Doe proceeding and also granted the requested secrecy order.
¶ 18. On September 6, 2012, Investigator Stelter filed an affidavit in support of a request for search warrants and subpoenas. The request covered a wide swath of desired information, including emails, conference call records, and bank records, dating from 2009 to 2012. In support of this request, Investigator Stelter provided details of numerous emails between a candidate committee and individuals and/or groups.
¶ 19. On December 13, 2012, Investigator Stelter filed another affidavit in support of a request for further search warrants and subpoenas. This affidavit provided additional details about the parties and how they operated in coordination with each other. The theory of the case, as put forward by the special prosecutor, is two-fold: (1) that the independent groups and the candidate committee worked "hand in glove" such that the independent groups became mere subcommittees of the candidate's committee, thus triggering reporting and disclosure requirements under Wis. Stat. §§ 11.10(4); and (2) that the coordinated issue *35 advocacy amounted to an unlawful in-kind contribution to the candidate committee under Wis. Admin. Code § GAB 1.20.
¶ 20. On January 18, 2013, Milwaukee County District Attorney John Chisholm met with then-Attorney General J.B. Van Hollen to discuss the ongoing investigation. District Attorney Chisholm sought to determine whether, given the statewide nature and gravity of the investigation, the Department of Justice ("DOJ") wished to become involved. On May 31, 2013, Attorney General Van Hollen sent District Attorney Chisholm a letter declining DOJ involvement in the investigation. Attorney General Van Hollen cited, among other things, potential conflicts of interest and the appearance of impropriety.
¶ 21. In July 2013, three more petitions to commence John Doe proceedings were filed: District Attorney Jane Kohlwey filed a petition in Columbia County circuit court on July 22, 2013; District Attorney Larry Nelson filed a petition in Iowa County circuit court on July 25, 2013; and District Attorney Kurt Klomberg filed a petition in Dodge County circuit court on July 26, 2013.
¶ 22. On August 7, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Iowa County John Doe proceeding. On August 21, 2013, Reserve Judge Kluka entered an order commencing the John Doe proceeding in Iowa County and also entered a secrecy order.
¶ 23. Also on August 7, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shir *36 ley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Dodge County John Doe proceeding. On August 21, 2013, Reserve Judge Kluka entered an order commencing the Dodge County John Doe proceeding and also entered a secrecy order.
¶ 24. On August 14, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Columbia County John Doe proceeding. On August 21, 2013, Reserve Judge Kluka entered an order commencing the John Doe proceeding and also entered a secrecy order.
¶ 25. On August 21, 2013, Dane County District Attorney Ismael Ozanne filed a petition in Dane County circuit court to commence a John Doe proceeding. On August 21, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Dane County John Doe proceeding. On August 21, 2013, Reserve Judge Kluka entered an order commencing the Dane County John Doe proceeding and also entered a secrecy order.
¶ 26. Also on August 21, 2013, the District Attorneys from all five counties sent a joint letter to Reserve Judge Kluka requesting the appointment of a special prosecutor to oversee the entire investigation. The District Attorneys encouraged Reserve Judge Kluka to appoint a special prosecutor on her own motion and in the exercise of her inherent authority. Their letter expressed concerns that it would be inefficient for five district attorneys to handle one investigation and that *37 there may be a perception of bias given their partisan affiliations. The letter recommended Francis Schmitz for the position.
¶ 27. On August 23, 2013, Reserve Judge Kluka entered separate, but identical, orders in all five John Doe proceedings appointing Francis Schmitz as special prosecutor with jurisdiction across the five counties. Mirroring the District Attorneys' position on the matter, Reserve Judge Kluka cited, as the basis of her appointment, concerns of efficiency and the appearance of impropriety. Reserve Judge Kluka made the appointment pursuant to her purported "authority" under State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 451, as well as her purported "inherent authority" under State v. Cummings, 199 Wis. 2d 721, 736, 546 N.W.2d 406 (1996). Each order fixed the special prosecutor's rate of pay at $130 per hour and stated that a copy should be sent to the Department of Administration.
¶ 28. On October 1, 2013, Reserve Judge Kluka authorized 29 subpoenas duces tecum to, among others, Unnamed Movants Nos. 1, 2, 3, 4, 5, and 8, based on an affidavit submitted to her by Investigator Stelter. These subpoenas compelled production of documents evidencing the conduct of coordination among the subpoenaed parties and a candidate committee, particularly the interaction between Unnamed Movants Nos. 1 and 2. That same day Reserve Judge Kluka authorized search warrants for the homes and offices of Unnamed Movants Nos. 6 and 7. The search warrants were executed at approximately 6:00 a.m. on October 3, 2013, in pre-dawn, armed, paramilitary-style raids in which bright floodlights were used to illuminate the targets' homes.
*38 ¶ 29. The breadth of the documents gathered pursuant to subpoenas and seized pursuant to search warrants is amazing. Millions of documents, both in digital and paper copy, were subpoenaed and/or seized. Deputies seized business papers, computer equipment, phones, and other devices, while their targets were restrained under police supervision and denied the ability to contact their attorneys. The special prosecutor obtained virtually every document possessed by the Unnamed Movants relating to every aspect of their lives, both personal and professional, over a five-year span (from 2009 to 2013). Such documents were subpoenaed and/or seized without regard to content or relevance to the alleged violations of Ch. 11. As part of this dragnet, the special prosecutor also had seized wholly irrelevant information, such as retirement income statements, personal financial account information, personal letters, and family photos.
¶ 30. Motions to quash the subpoenas were filed by Unnamed Movant No. 1 on October 17, 2013, and by Unnamed Movants Nos. 2 and 3 on October 25, 2013. On October 29, 2013, before ruling on the motions, Reserve Judge Kluka recused herself from the Milwaukee County proceeding, citing only an unspecified "conflict." The Milwaukee County proceeding was reassigned by Chief Judge Kremers to Reserve Judge Gregory Peterson on October 29, 2013.
¶ 31. The next day, on October 30, 2013, Reserve Judge Kluka disqualified herself from the remaining John Doe proceedings. On November 1, 2013, Chief Judge Potter of the Sixth Judicial District assigned Reserve Judge Peterson to preside over the John Doe proceedings in Columbia County and Dodge County. On November 1, 2013, Chief Judge Duvall of the Seventh Judicial District assigned Reserve Judge Pe *39 terson to preside over the John Doe proceeding in Iowa County. On November 4, 2013, Chief Judge Daley of the Fifth Judicial District assigned Reserve Judge Peterson to preside over the John Doe proceeding in Dane County. Thereafter, on November 4, 2013, Director Voelker (with then-Chief Justice Shirley Abraham-son's name directly above) assigned Reserve Judge Peterson to preside over the Milwaukee County John Doe proceeding. On November 11, 2013, Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Peterson to preside over the John Doe proceedings in Iowa i County and Dane County. On November 14, 2013, Director Volker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Peterson to preside over the John Doe proceedings in Columbia County and Dodge County.
¶ 32. Also on November 14, 2013, Unnamed Movants Nos. 2, 6, and 7 filed with the court of appeals a petition for supervisory writs of mandamus and prohibition directed at Reserve Judges Kluka and Peterson {Three Unnamed Petitioners). The Unnamed Movants alleged procedural defects involving the appointment of a reserve judge to oversee a multi-county John Doe investigation and the appointment of the special prosecutor. The Unnamed Movants asked the court of appeals to declare the John Doe investigation void ab initio.
¶ 33. In an order dated November 22, 2013, the court of appeals summarily dismissed what it deemed the Unnamed Movants' "first and sixth claims," namely, that there is no statutory authority to appoint or assign a reserve judge to preside over a John Doe proceeding, and that the John Doe judge circumvented the statutory functions of the clerks of court in five *40 counties by requiring certain documents be sent to a post office box. Three Unnamed Petitioners, Nos. 2013AP2504-W-2508-W, unpublished order 6-7 (Wis. Ct. App. Nov. 22, 2013). Regarding the first claim, the court of appeals reasoned that there is no statute that limits the ability of reserve judges to oversee John Doe investigations. Id. Moreover, the court of appeals noted that the statute authorizing the appointment of reserve judges explicitly states that reserve judges "shall perform the same duties as other judges." Id. (citing Wis. Stat. § 53.075). The court of appeals ordered the respondents to address the remaining claims concerning the legality of a multi-county John Doe proceeding, the legality of a special prosecutor handling a multicounty John Doe proceeding, and the legality of the special prosecutor's appointment under Wis. Stat. § 978.045. Id.
¶ 34. While that case was pending at the court of appeals, Unnamed Movant No. 6 also filed a petition in Dodge County circuit court on December 4, 2013, for the return of the property taken pursuant to the October 1 search warrant. On December 20, 2013, Unnamed Movant No. 7 filed a substantially similar petition in Dane County circuit court. After a response by the special prosecutor, Reserve Judge Peterson granted the motions to quash the subpoenas and the petitions to return property on January 10, 2014. Reserve Judge Peterson reasoned:
I conclude the subpoenas do not show probable cause that the moving parties committed any violations of the campaign finance laws. I am persuaded the statutes only prohibit coordination by candidates and independent organizations for a political purpose, and political purpose, with one minor exception not rel *41 evant here ... requires express advocacy. There is no evidence of express advocacy.
Before there is coordination there must be political purposes; without political purposes, coordination is not a crime.
As relevant here, acts are for political purposes when they are made to influence the recall or retention of a person holding office. Wis. Stat. § 11.01(16). If the statute stopped here, the definition of political purposes might well be unconstitutionally vague. Buckley v. Valeo, 424 U.S. 1, 77 (1976). But the definition continues: acts for political purposes include, but are not limited to, making a communication that expressly advocates the recall or retention of a clearly identified candidate. Wis. Stat. § 11.01(16)(a). In GAB 1.28, the GAB attempted to flesh out other acts that would constitute political purposes, but because of constitutional challenges it has stated it will not enforce that regulation. So the only clearly defined political purpose is one that requires express advocacy.
The state is not claiming that any of the independent organizations expressly advocated. Therefore, the subpoenas fail to show probable cause that a crime was committed.
¶ 35. As for the search warrants executed on the homes and offices of Unnamed Movants Nos. 6 and 7, Reserve Judge Peterson reasoned:
The same legal conclusions should apply to all parties who have raised challenges in this case. Therefore, for the reasons stated above regarding the limitations in the scope of the campaign finance laws, I conclude that the warrants lack probable cause.
*42 f 36. The special prosecutor requested a stay of the order, which was granted on January 27, 2014. In his order granting the stay, Reserve Judge Peterson also clarified that he was incorrect in stating that the probable cause standard applied to subpoenas. Nevertheless, he concluded that a subpoena is not "valid when based on an invalid interpretation of the law." As a condition of the stay, Reserve Judge Peterson ordered the State not to examine any of the property seized pursuant to search warrants.
¶ 37. On January 30, 2014, the court of appeals issued an opinion and order in Three Unnamed Petitioners addressing the remaining issues and denying the supervisory writ. Regarding the legality of a multicounty John Doe proceeding, the court of appeals reasoned that there were five separate proceedings in five separate counties and that it is not unusual for courts to hold joint proceedings or to issue joint orders in non-consolidated cases that share a common factual basis, raise the same legal issue, or involve overlapping parties. Three Unnamed Petitioners, Nos. 2013AP2504-W-2508-W, unpublished slip op. & order 3-4 (Wis. Ct. App. Jan. 30, 2014). The court of appeals used the same reasoning to justify the legality of a special prosecutor handling multi-county John Doe proceedings. Id. at 4-7. As for the legality of the special prosecutor's appointment under Wis. Stat. § 978.045, the court of appeals determined that the special prosecutor was appointed pursuant to Reserve Judge Kluka's "authority" under Carlson, and "inherent authority" under Cummings, not under Wis. Stat. § 978.045, the special prosecutors statute. Id. On February 19, 2014, the Unnamed Movants filed a petition for review in this court, which we granted on December 16, 2014.
*43 ¶ 38. Meanwhile, on February 7, 2014, Unnamed Movants Nos. 6 and 7 filed a petition for leave to commence an original action in the Wisconsin Supreme Court under Article VII, Section 3(2) of the Wisconsin Constitution[15] (Two Unnamed Petitioners). The original action sought a declaration confirming the ruling of Reserve Judge Peterson in his January 10, 2014, order. The special prosecutor filed a response to this petition on February 25, 2014. We granted the original action on December 16, 2014.
¶ 39. On February 21, 2014, the special prosecutor filed a petition for a supervisory writ and a writ of mandamus in the court of appeals (Schmitz v. Peterson). The special prosecutor sought the supervisory writ in order to vacate Reserve Judge Peterson's January 10, 2014, order and to direct Reserve Judge Peterson to enforce the subpoenas and search warrants. Unnamed Movants Nos. 1, 2, 3, 4, 5, 6, 7, and 8 filed responses to the petition on March 31, 2014. Shortly thereafter, the Unnamed Movants brought a petition to bypass the court of appeals. We granted bypass on December 16, 2014.
¶ 40. Finally, on November 3, 2014, Unnamed Movants Nos. 6 and 7 filed a motion with Reserve Judge Peterson requesting an order to show cause as to why the John Doe proceeding should not be ended. *44 Reserve Judge Peterson denied that motion but concluded that if appellate courts agreed with his interpretation of Ch. 11, the "consequence will no doubt be the end of the John Doe investigation."
III. TWO UNNAMED PETITIONERS
¶ 41. We turn first to Two Unnamed Petitioners, the original action filed with the Wisconsin Supreme Court. This case requires us to interpret Wisconsin's campaign finance law, Wis. Stat. Ch. 11. By its very nature, this task involves fundamental questions regarding the scope of the government's ability to regulate political speech. To resolve this case, we must engage in statutory interpretation of the phrase "political purposes," which includes all activities "done for the purpose of influencing [an] election." Wis. Stat. § 11.01(16). We conclude, consistent with the First Amendment of the United States Constitution and Article I, Section 3 of the Wisconsin Constitution, that the plain language of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague if it is not given a limiting construction and applied to only express advocacy and its functional equivalent. This conclusion invalidates the special prosecutor's theory of the case and ends the John Doe investigation. Therefore, we agree with the Unnamed Movants and grant their requested relief.
A. Standard of Review
¶ 42. Statutory interpretation is a question of law, which this court reviews de novo. Covenant Healthcare Sys., Inc. v. City of Wauwatosa, 2011 WI 80, ¶ 21, 336 Wis. 2d 522, 800 N.W.2d 906. In this case, *45 our statutory interpretation implicates the constitutionality of specific provisions in Chapter 11, which is also a question of law which we review de novo. Janssen, 219 Wis. 2d at 370.
¶ 43. Statutes are presumed to be constitutional, "and the party seeking to overcome the presumption must prove the statute unconstitutional beyond a reasonable doubt." Id. When the statute implicates the exercise of First Amendment rights, however, "[t]he burden shifts to the proponent of the statute." Id. at 370-71. Here, the proponent is the special prosecutor.
B. The First Amendment and the Doctrines of Vagueness and Overbreadth
i. First Amendment Principles
¶ 44. In addressing the scope of Wisconsin's campaign finance law we are keenly aware that this task bears directly on the ability of all citizens in our State to engage in the democratic process. The special prosecutor's theories implicate one of the foundational principles of our nation: the freedom of speech, specifically, political speech. We therefore begin our analysis with the words of the First Amendment: "Congress shall make no law. . . abridging the freedom of speech." U.S. Const, amend. I.[16] Article I, Section 3 of the Wisconsin Constitution guarantees that: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press."
*46 ¶ 45. While the First Amendment protects a broad range of speech and conduct, "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. ... of course includ(ing) discussions of candidates . . . ." Buckley, 424 U.S. at 14 (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)). Indeed, "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010). "In a republic [such as ours] where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." Buckley, 424 U.S. at 14-15. These values reflect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (emphasis added).
¶ 46. Our protection of the freedom of political speech reflects our firm belief that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Buckley, 424 U.S. at 14. "At the founding, speech was open, comprehensive, and vital to society's definition of itself; there were no limits on the sources of speech and knowledge." Citizens United, 558 U.S. at 353. Therefore, "[t]he First Amendment affords the broadest protection to [] political expression in order 'to assure *47 (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Buckley, 424 U.S. at 14 (quoting Roth v. United States, 354 U.S. 476, 484 (1957)).
¶ 47. Accordingly, "the First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1441 (2014) (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971)). There exists "no right more basic in our democracy than the right to participate in electing our political leaders." Id. at 1440-41. Political speech is thus a fundamental right and is afforded the highest level of protection. Indeed, freedom of speech, especially political speech, is the right most fundamental to our democracy. To that end, we must conduct a particularly "[c]lose examination of the specificity of the statutory limitation . . . where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests." Buckley, 424 U.S. at 40-41. "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: People 'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.'" Citizens United, 558 U.S. at 324 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).
¶ 48. However, there are certain, limited circumstances in which the government may regulate and impose burdens upon the exercise of free speech. In the *48 campaign finance context, these include disclosure and reporting requirements, as well as contribution limits to candidates.[17] The justification for imposing such restrictions is to "prevent[] corruption and the appearance of corruption." WRTL II, 551 U.S. at 478 (quotations omitted). The interest in preventing the corruption of public officials, however, does not justify the regulation of all political speech. Rather, the United States Supreme Court has drawn an important "distinction between discussion of issues and candidates and advocacy of election or defeat of candidates." Buckley, 424 U.S. at 42. The compelling governmental interest that justifies the regulation of express advocacy (the prevention of quid pro quo[18] corruption) " 'might not apply to'" the regulation of issue advocacy. WRTL II, 551 U.S. at 471 (quoting McConnell v. Fed. Election Comm'n, 540 U.S. 93, 209 n.88 (2003)). Indeed, "[s] pending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such quid pro quo corruption." McCutcheon, 134 S. Ct. at 1450. "Nor does the possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political parties." Id. at 1451 (quoting Citizens United, 558 U.S. at 359).
¶ 49. A key reason that issue advocacy is afforded greater protection under the First Amendment is that "[freedom of discussion, if it would fulfill its *49 historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." Thornhill v. Alabama, 310 U.S. 88, 102 (1940). "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election." WRTL II, 551 U.S. at 474.
¶ 50. In order to give the fullest protection possible to the right to the exercise of political speech, "the government's authority to regulate in this area extends only to money raised and spent for speech that is clearly election relatedl, that is, express advocacy]; ordinary political speech about issues, policy, and public officials [, that is, issue advocacy,] must remain unencumbered." Barland II, 751 F.3d at 810 (emphasis added). Thus, in order to avoid a chilling effect on otherwise protected speech, "when the regulatory scheme reaches beyond candidates, their campaign committees, and political parties. . . . [the] government may regulate . . . only with narrow specificity." Id. at 811 (quotations omitted). "In short, [we] must give the benefit of any doubt to protecting rather than stifling speech." WRTL II, 551 U.S. at 469; see also McCutcheon, 134 S. Ct. at 1451 (quoting WRTL II, 551 U.S. at 457) (" '[T]he First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it.'").
¶ 51. To that end, "in the domain of campaign-finance law, the First Amendment requires a heightened degree of regulatory clarity and a close fit between the government's means and its end." Barland II, 751 F.3d at 808. This "close fit" requirement is intended to prevent the dangerous chilling effect an *50 unclear or imprecise law has on protected speech. Id. at 835. To guard against inhibiting protected political speech, courts use the overbreadth and vagueness doctrines. These doctrines "reflecto the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted." Janssen, 219 Wis. 2d at 372 (citation omitted).
ii. Overbreadth and Vagueness
¶ 52. "A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." Id. at 374 (citation omitted). The overbreadth doctrine "recognize [s] that broadly written statutes substantially inhibiting free expression should be open to attack even by a party whose own conduct remains unprotected under the First Amendment." State v. Stevenson, 2000 WI 71, ¶ 11, 236 Wis. 2d 86, 613 N.W.2d 90. "The danger inherent in overbroad statutes is that such statutes provide [the government with] practically unbridled administrative and prosecutorial discretion that may result in selective] prosecution based on certain views deemed objectionable by law enforcement." Id., ¶ 13. Thus, "[o]verbroad statutes may undesirably dissuade persons from exercising their rights by 'chilling' their protected speech or expression." Janssen, 219 Wis. 2d at 372 (citation omitted). In other words, the threat to free expression created by overbroad statutes is that, by potentially sweeping in constitutionally protected activity, individuals and groups may self-censor out of fear of vindictive or selective prosecution.
*51 ¶ 53. When faced with an overbroad statute, courts have several options.
First, courts may apply a limiting construction to rehabilitate the statute when such a narrowing and validating construction is readily available. Second, courts may cure the constitutional defect by severing the unconstitutional provisions of a statute and leaving the remainder of the legislation intact. Finally, courts may determine that the statute is not amenable to judicial limitation or severance and invalidate the entire statute upon a determination that it is unconstitutional on its face.
Stevenson, 236 Wis. 2d 86, ¶ 15 (internal citations omitted).
¶ 54. Related to the overbreadth doctrine is the vagueness doctrine,[19] which "requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" State v. Princess Cinema of Milwaukee, Inc., 96 Wis. 2d 646, 657, 292 N.W.2d 807 (1980) (quoting Smith v. Goguen, 415 U.S. 566, 572-73 (1974)). A vague statute "is one which operates to hinder free speech through the use of language which is so vague as to allow the inclusion of *52 protected speech in the prohibition or to leave the individual with no clear guidance as to the nature of the acts which are subject to punishment." Id. at 656. "Where First Amendment rights are involved, an even 'greater degree of specificity' is required." Buckley, 424 U.S. at 77 (citations omitted). Thus, when a criminal statute implicates First Amendment rights, the statutory language must have the "utmost clarity and exactitude." Stevenson, 236 Wis. 2d 86, ¶ 30. Thus, the vagueness doctrine concerns the
impingement] upon three first amendment values: (1) it does not provide individuals with fair warning of what is prohibited; (2) lacking precise or articulated standards, it allows for arbitrary or discriminatory enforcement; and (3) it causes citizens to 'forsake activity protected by the First Amendment for fear it may be prohibited.1
State v. Thiel, 183 Wis. 2d 505, 521 n.9, 515 N.W.2d 847 (1994) (quoting M.S. News Co. v. Casado, 721 F.2d 1281, 1290 (10th Cir. 1983)). In other words, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in [this] area only with narrow specificity." Barland II, 751 F.3d at 811 (quotations omitted).
C. The Definition of "Political Purposes" in Wis. Stat. § 11.01(16) is Overbroad and Vague Unless Limited to Express Advocacy and Its Functional Equivalent.
¶ 55. The special prosecutor alleges that the Unnamed Movants engaged in illegally coordinated issue advocacy. However, the basis for his theory has evolved over the course of the various legal challenges to his *53 investigation, and he appears unable to decide just how the Unnamed Movants have broken the law.[20]
¶ 56. Today, the special prosecutor alleges two theories of illegal coordination: (1) that the coordination between the Unnamed Movants is so extensive that the supposedly independent groups became subcommittees for the candidate's campaign under Wis. Stat. § 11.10(4); and (2) that the coordinated issue advocacy amounts to an in-kind contribution under Wis. Admin. Code § GAB 1.20. The special prosecutor's theories, if adopted as law, would require an individual to surrender his political rights to the government and retain campaign finance attorneys before discussing salient political issues. See Citizens United, 558 U.S. at 324. We find no support for the special prosecutor's theories in Wis. Stat. Ch. 11. Chapter 11's definition of "political purposes," which underlies Wisconsin's campaign finance law, is both overbroad and vague and thus unconstitutionally chills speech because people " 'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.'" Id. (quoting Connally, 269 U.S. at 391).
¶ 57. However, by limiting the definition of "political purposes" to express advocacy and its functional equivalent, we ensure that all issue advocacy will remain unencumbered. This limiting construction[21] allows us to protect political speech, a vital First *54 Amendment right, and allows us to guard against the theories of the special prosecutor and those who would rely on overbroad and vague statutes to silence those with whom they disagree.
i. The Definition and Scope of "Political Purposes" in Wis. Stat. § 11.01(16) Must Be Limited to Only Express Advocacy.
¶ 58. We begin our analysis by noting that Wisconsin's campaign finance law "is labyrinthian and difficult to decipher without a background in this area of the law." Barland II, 751 E3d at 808. Indeed, "[t]o a lay reader [Chapter 11] require [s] almost any group that wants to say almost anything about a candidate or election to register as a political committee." Id. at 810 (citing Wis. Right to Life, Inc. v. Paradise, 138 F.3d 1183, 1184 (7th Cir. 1998)). However, in analyzing the statutes, it becomes readily apparent that the entire regulatory scheme depends on but a few key terms: "committee," "contribution," "disbursement," and "political purposes."
¶ 59. "Committee" is defined in Wis. Stat. § 11.01(4) as "any person other than an individual and any combination of 2 or more persons, permanent or temporary, which makes or accepts contributions or makes disbursements, whether or not engaged in activities which are exclusively political, except that a 'committee' does not include a political 'group' under this chapter." As one can see from the statutory definition, committee status under Wisconsin campaign finance law depends on the definitions of "contributions" and "disbursements."
¶ 60. "Contribution" has a very lengthy definition, but the relevant portion is contained in Wis. Stat. § 11.01(6)(a)l, which states that "contribution" means
*55 [a] gift, subscription, loan, advance, or deposit of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, made for political purposes. In this subdivision "anything of value" means a thing of merchantable value.
(emphasis added). The definition of "disbursement" largely parallels the definition of "contribution," the relevant portion of which states that a "disbursement" is
[a] purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, made for political purposes. In this subdivision, "anything of value" means a thing of merchantable value.
Wis. Stat. § 11.01(7)(a)l (emphasis added). It is apparent from the emphasized language that whether or not something is a contribution or disbursement depends on the definition of "political purposes."
¶ 61. "Political purposes" is defined, in relevant part, as an act
done for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, for the purpose of payment of expenses incurred as a result of a recount at an election, or for the purpose of influencing a particular vote at a referendum. In the case of a candidate, or a committee or group which is organized primarily for the purpose of influencing the election or nomination *56 for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, or for the purpose of influencing a particular vote at a referendum, all administrative and overhead expenses for the maintenance of an office or staff which are used principally for any such purpose are deemed to be for a political purpose.
(a) Acts which are for "political purposes" include but are not limited to:
1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate or a particular vote at a referendum.
Wis. Stat. § 11.01(16) (emphasis added).
¶ 62. Thus, the lynchpin of Wisconsin's campaign finance law is whether an act is done for "political purposes." Chapter 11 regulates "disbursements" and "contributions," and the phrase "political purposes" is used in the definition of each of those words. See Wis. Stat. §§ 11.01(7) (defining "disbursement"), 11.01(6) (defining "contribution"). If an act is not done for "political purposes," then it is not a disbursement or a contribution, and it therefore is not subject to regulation under Ch. 11.
¶ 63. The Seventh Circuit in Barland II held that the phrase "political purposes," as defined in Wis. Stat. § 11.01, is both vague and overbroad. Barland II, 751 F.3d at 833. The court reasoned that the U.S. Supreme Court in Buckley held that the phrase "influence an election," which also appears in the definition of "political purposes," is vague and overbroad. Id. at 833 ("The [Buckley] Court held that this kind of broad and imprecise language risks chilling issue advocacy, which may not be regulated; the same reasoning *57 applies here."). Further, the court concluded the phrase "include but are not limited to" renders the definition of "political purposes" vague and overbroad because "[t]he 'not limited to' language holds the potential for regulatory mischief." Id.; see also Elections Bd. of State of Wis. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 677, 597 N.W.2d 721 (1999) (WMC) (concluding that the express advocacy standard under Wis. Stat. § 11.01(16)(a)l must still be consistent with Buckley, lest it become a trap for the innocent and unwary.)
¶ 64. The special prosecutor has completely disregarded these principles. The lack of clarity in Ch. 11, which the special prosecutor relies upon, leads us to the unsettling conclusion that it is left to government bureaucrats and/or individual prosecutors to determine how much coordination between campaign committees and independent groups is "too much" coordination. In essence, under his theory, every candidate, in every campaign in which an issue advocacy group participates, would get their own John Doe proceeding and their own special prosecutor to determine the extent of any coordination. This is not, and cannot, be the law in a democracy.
¶ 65. More fundamentally, however, the fact that these questions arise at all is proof that the definition of "political purposes" "holds the potential for regulatory mischief. Perhaps [the express advocacy language] was included to leave room for regulation of the 'functional equivalent' of express advocacy as that term was later explained in [WRTL II]. Beyond that, however, the language contains persistent vagueness and overbreadth." Barland II, 751 F.3d at 833. In fact, the Government Accountability Board ("GAB") conceded this point in Borland II and suggested a limiting *58 construction to the Seventh Circuit that would "confine the definitions [of "political purposes"] to express advocacy and its functional equivalent." Id. That is precisely the construction the Seventh Circuit adopted, and we conclude that same limiting construction should apply here as well.
¶ 66. To be clear, the reason that the definition of "political purposes" in § 11.01(16) is unconstitutional is because the phrase "influencing [an] election" is so broad that it sweeps in protected speech, as well as speech that can be subject to regulation. "Influencing [an] election" obviously includes express advocacy, but without a limiting construction it could just as easily include issue advocacy aired during the closing days of an election cycle. This is precisely the kind of over-broad language that the Supreme Court has repeatedly rejected. "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election." WRTL II, 551 U.S. at 474 (emphasis added). We must have clear rules that protect political speech, and we must continue to reject the idea that some protected speech may be chilled or restricted simply because it is "difficult to distinguish from unprotected speech." Id. at 494 (Scalia, J., concurring). "[L]aws targeting political speech are the principal object of the First Amendment guarantee. The fact that the line between electoral advocacy and issue advocacy dissolves in practice is an indictment of the statute, not a justification of it." Id.
¶ 67. We therefore hold that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague. In order to cure this overbreadth and vagueness, we adopt a construction of § 11.01(16) that limits the definition of "political pur *59 poses" to include only express advocacy and its functional equivalent, as those terms are defined in Buckley and WRTL II. This construction is "readily available" due to the Seventh Circuit's decision in Barland II. See Stevenson, 236 Wis. 2d 86, ¶ 15; Barland II, 751 F.3d at 834 (explaining that "[t]he [Wisconsin Supreme Court] and D Attorney General have acknowledged that when Chapter 11 is applied beyond candidates, their committees, and political parties, it must be narrowly construed to comply with Buckley's express-advocacy limitation; the administration of the state's campaign-finance system has generally reflected this understanding for many decades.").[22] Given that Chapter ll's requirements depend on whether an act is done for "political purposes," the effect of this limiting construction places "issue advocacy. . . beyond the reach of [Wisconsin's] regulatory scheme." Barland II, 751 F.3d at 815.
ii. The Special Prosecutor's Theories of Coordination Depend on Coordinated Issue Advocacy, Which Is Not Regulated Under Chapter 11.
¶ 68. Having reached our conclusion about the scope of conduct regulated by Chapter 11, we now turn to the special prosecutor's theories of coordination and *60 whether the alleged conduct is regulated under Wisconsin law.[23] The special prosecutor has disregarded *61 the vital principle that in our nation and our state political speech is a fundamental right and is afforded the highest level of protection. The special prosecutor's theories, rather than "assuring] [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth, 354 U.S. at 484, instead would assure that such political speech will be investigated with paramilitary-style home invasions conducted in the pre-dawn hours and then prosecuted and punished. In short, the special prosecutor completely ignores the command that, when seeking to regulate issue advocacy groups, such regulation must be done with "narrow specificity." Borland II, 751 F.3d at 811 (quotations omitted).
¶ 69. The limiting construction that we apply makes clear that the special prosecutor's theories are unsupportable in law given that the theories rely on overbroad and vague statutes. By limiting the definition of "political purposes" to express advocacy and its functional equivalent, political speech continues to be protected as a fundamental First Amendment right.
¶ 70. The special prosecutor's first theory of illegal coordination is that ostensibly independent, advocacy groups operated "hand in glove" with the candidate's committee, which made the independent groups subcommittees under Wis. Stat. § 11.10(4). The relevant part of this statute states that
[a]ny committee which is organized or acts with the cooperation of or upon consultation with a candidate or agent or authorized committee of a candidate, or which acts in concert with or at the request or suggestion of *62 a candidate or agent or authorized committee of a candidate is deemed a subcommittee of the candidate's personal campaign committee.
Wis. Stat. § 11.10(4) (emphasis added). The special prosecutor argues that coordinated issue advocacy is prohibited under this provision because the statute itself only requires cooperation between a candidate's committee and another committee and that the statute does not require that such cooperation be limited to express advocacy.
¶ 71. The first flaw in the special prosecutor's theory is that it is left to the whim of each regulatory bureaucrat and/or prosecutor to subjectively determine how much coordination is "too much." Indeed, the special prosecutor, because he relies on vague and over-broad statutes, will be the only one to know how much coordination is "too much." This cannot be; such an interpretation of § 11.10(4) is unconstitutionally over-broad and vague under the First Amendment. See Princess Cinema, 96 Wis. 2d at 657 (citations omitted) ("The void for vagueness doctrine '. . . incorporates the notions of fair notice or warning.... (i)t requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement."'").
¶ 72. However, there is another, more obvious flaw in the special prosecutor's theory. Wisconsin Stat. § 11.10(4) refers to a "committee" that coordinates with a candidate's committee and in order to be a "committee," an entity must "make[] or accept [] contributions or make[] disbursements." In order to come within the purview of regulated acts both "contributions" and "disbursements" must be "made for political purposes." *63 Wis. Stat. §§ 11.01(6)(a)l; 11.01(7)(a)l. Applying the necessary limiting construction to the phrase "for political purposes," we conclude that in order to meet the statutory definition of "committee," a committee must engage in express advocacy and its functional equivalent. This conclusion is fatal to the special prosecutor's subcommittee theory because he does not allege that the Unnamed Movants engaged in express advocacy. Put simply, because the Unnamed Movants did not engage in express advocacy, they could not be considered a "committee" subject to Chapter ll's regulation.
¶ 73. The special prosecutor's second theory of illegal coordination is that the coordinated issue advocacy should have been reported as "in-kind contributions" by the candidate's committee. This "in-kind contribution" theory rests on the assumption that any issue advocacy engaged in by the Unnamed Movants was done for the benefit of the candidate and therefore should have been reported. Once again, the special prosecutor's theory fails.
¶ 74. An "in-kind contribution" is defined in the GAB's regulations as "a disbursement by a contributor to procure a thing of value or service for the benefit of a registrant who authorized the disbursement." GAB 1.20(l)(e) (emphasis added). By its plain language, the definition of an in-kind contribution depends on the making of a "disbursement." As a result of the limiting construction of "political purposes," there can be no "disbursement" under Chapter 11, or the corresponding regulations, without express advocacy or its functional equivalent. Even assuming that the special prosecutor is correct and the Unnamed Movants engaged in issue advocacy at the specific request of the candidate or the candidate's committee, those actions do not give rise to *64 a reportable "in-kind contribution" because under Ch. 11 issue advocacy cannot be a "disbursement."
¶ 75. In sum, we hold that, consistent with the First Amendment to the United States Constitution and Article I, Section 3 of the Wisconsin Constitution, the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague because its language "is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." Janssen, 219 Wis. 2d at 374. However, there is a readily available limiting construction that will prevent the chilling of otherwise protected speech, and we hold that "political purposes" is limited to express advocacy and its functional equivalent as those terms are defined in Buckley and WRTLII. With this limiting construction in place, Chapter 11 does not regulate the alleged conduct of the Unnamed Movants. The special prosecutor has not alleged any express advocacy, and issue advocacy, whether coordinated or not, is "beyond the reach of the regulatory scheme." Barland II, 751 F.3d at 815. Accordingly, we grant the relief requested by the Unnamed Movants.
¶ 76. To be clear, this conclusion ends the John Doe investigation because the special prosecutor's legal theory is unsupported in either reason or law. Consequently, the investigation is closed. Consistent with our decision and the order entered by Reserve Judge Peterson, we order that the special prosecutor and the district attorneys involved in this investigation must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials *65 obtained through the investigation. All Unnamed Movants are relieved of any duty to cooperate further with the investigation.
IV. SCHMITZ V. PETERSON
¶ 77. We turn now to the second case presented for our review, Schmitz v. Peterson. This case is before us on petitions to bypass the court of appeals filed by the Unnamed Movants. In this case, the special prosecutor seeks a supervisory writ in order to reverse Reserve Judge Peterson's decision to quash the subpoenas and search warrants issued by Reserve Judge Kluka. The specific issue presented is whether the evidence gathered in the John Doe proceedings provide a reasonable belief that Wisconsin's campaign finance law was violated by a campaign committee's coordination with independent advocacy organizations.
¶ 78. We hold that the special prosecutor has failed to prove that Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all property seized by the special prosecutor. In quashing the subpoenas and search warrants, Reserve Judge Peterson exercised his discretion under the John Doe statute, Wis. Stat. § 968.26, to determine the extent of the investigation. Because the purpose of a supervisory writ does not include review of a judge's discretionary acts, Kalal, 271 Wis. 2d 633, ¶ 24, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.
A. Standard of Review
¶ 79. The decisions of John Doe judges "are not subject to direct appeal" to the court of appeals "be *66 cause an order issued by a John Doe judge is not an order of a 'circuit court' or a 'court of record.'" In re John Doe Proceeding, 2003 WI 30, ¶¶ 23, 41, 260 Wis. 2d 653, 660 N.W.2d 260. Nonetheless, a party may seek review of a John Doe judge's actions "pursuant to a petition for supervisory writ." Id., ¶ 41; see also Wis. Stat. § 809.51(1).
¶ 80. It is well settled that "[a] writ of supervision is not a substitute for an appeal." Kalal, 271 Wis. 2d 633, ¶ 17 (quotations omitted). In order to prevail on a supervisory writ, the petitioner must prove the following: "(1) an appeal is an inadequate remedy; (2) grave hardship or irreparable harm will result; (3) the duty of the trial court is plain and it must have acted or intends to act in violation of that duty; and (4) the request for relief is made promptly and speedily." Id. (quoting Burnett v. Alt, 224 Wis. 2d 72, 96-97, 589 N.W.2d 21 (1999)) (emphasis added). "A plain duty 'must be clear and unequivocal and, under the facts, the responsibility to act must be imperative.' " Id., ¶ 22 (quoting State ex rel. Kurkierewicz v. Cannon, 42 Wis. 2d 368, 377-78, 166 N.W.2d 255 (1969)).
¶ 81. "A supervisory writ 'is considered an extraordinary and drastic remedy that is to be issued only upon some grievous exigency.'" Id., ¶ 17 (citation omitted). The obligation of a judge to correctly find facts and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure, "as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law." Id., ¶ 24. Instead,
*67 [t]he obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system. The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process. To adopt [a contrary] interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process.
Id. (emphasis added) (citations omitted).
B. Nature of John Doe Proceedings
¶ 82. Before analyzing Reserve Judge Peterson's decision to quash the subpoenas and search warrants, it is necessary for us to provide background regarding the proper conduct of John Doe proceedings, which have been in use in Wisconsin since its days as a territory. In re Doe, 317 Wis. 2d 364, ¶ 13. This discussion is necessary to educate the public on the nature of this important investigatory tool, and also to provide guidance to the lower courts on the proper conduct of John Doe proceedings.
¶ 83. Wisconsin's John Doe proceeding, codified in Wis. Stat. § 968.26, serves two important purposes. State ex rel. Reimann v. Circuit Court for Dane Cnty., 214 Wis. 2d 605, 621, 571 N.W.2d 385 (1997). "First, and most obvious, a John Doe proceeding is intended as an investigatory tool used to ascertain whether a crime has been committed and if so, by whom. Second, the John Doe proceeding is designed to protect innocent citizens from frivolous and groundless prosecu *68 tions." Id. (citations omitted). In order to fulfill the dual purposes of the John Doe statute, a John Doe judge
serves an essentially judicial function. The judge considers the testimony presented. It is the responsibility of the John Doe judge to utilize his or her training in constitutional and criminal law and in courtroom procedure in determining the need to subpoena witnesses requested by the district attorney, in presiding at the examination of witnesses, and in determining probable cause. It is the judge's responsibility to ensure procedural fairness.
State v. Washington, 83 Wis. 2d 808, 823, 266 N.W.2d 597 (1978) (footnote omitted).
¶ 84. "Wisconsin Stat. § 968.26 outlines a four-step process for John Doe proceedings." In re Doe, 317 Wis. 2d 364, ¶ 14. "First, the judge must determine whether a complainant has alleged 'objective, factual assertions sufficient to support a reasonable belief that a crime has been committed.'" Id. (citation omitted). Second, if the complainant meets this burden, "the judge must proceed with a hearing at which 'the judge shall examine the complainant under oath and any witnesses produced by him or her.'" Id., ¶ 15 (quoting Wis. Stat. § 968.26 (2007-08)). Third, when this hearing is over, "a judge must determine whether probable cause exists as to each essential element of the alleged crime." Id., ¶ 16. "Finally, if the judge determines that probable cause is present — that is, that a crime probably has been committed — and who the perpetrator of the alleged crime is, the judge may order that a criminal complaint be reduced to writing. . . ." Id., ¶ 17. This process gives a John Doe judge "broad discretion to decide whether to file a criminal complaint, even upon a finding of probable cause." Id.
*69 ¶ 85. In order to commence a John Doe proceeding, the complainant, whether it be the district attorney or anyone else, must demonstrate to the John Doe judge "that he has reason to believe that a crime has been committed within the jurisdiction." State v. Doe, 78 Wis. 2d 161, 165, 254 N.W.2d 210 (1977). If "the judge finds that the complainant has failed to establish 'reason to believe []' [that a crime has been committed,] that judge may deny the John Doe petition without conducting an examination." Reimann, 214 Wis. 2d at 625. Thus, the John Doe judge must act as a gatekeeper and screen out "petitions that are spurious, frivolous, or groundless." Id. at 624. "In determining whether the petition is worthy of further treatment, a circuit court judge [presiding over a John Doe proceeding] must act as a neutral and detached magistrate." Id. at 625 (emphasis added).
¶ 86. Therefore, from the earliest stages of the proceeding, to the conclusion of the investigation, "[t]he proceedings of the John Doe are constantly under the scrutiny of a judge." Doe, 78 Wis. 2d at 165. The John Doe judge does not act as "chief investigator" or as a mere arm of the prosecutor. Washington, 83 Wis. 2d at 823. Rather, the John Doe judge serves as a check on the prosecutor and on the complainant to ensure that the subject(s) of the investigation receive(s) due process of law. See Doe, 78 Wis. 2d at 164-65.
¶ 87. In this way, Wisconsin's John Doe proceeding is very different than a grand jury, and when conducted appropriately, provides much greater protections to the target of an investigation. Id. at 165. *70 This is due in no small part to the role played by the John Doe judge, which is to ensure that the investigation stays focused on the conduct alleged in the petition to commence the John Doe proceeding. Washington, 83 Wis. 2d at 841-42. Further,
[ajnyone familiar with the functions of the grand jury or who has dealt with it knows the hazards of a run-away grand jury, which can go beyond the restraints of the prosecutor, the executive, or of the judiciary. Such hazards do not exist in the Wisconsin John Doe. While John Doe proceedings can be abused, the document produced by a John Doe does not ipso facto force the defendant to trial. The complaint which emanates from it is issued under the aegis of a judge but nevertheless must subsequently stand the scrutiny of an open court inspection in an adversary proceeding at the preliminary examination as a prerequisite to the filing of an information, arraignment, and trial.
Doe, 78 Wis. 2d at 170-71. Thus, "[a] John Doe proceeding . . . serves both as an inquest into the discovery of crime and as a screen to prevent 'reckless and ill-advised' prosecutions." Reimann, 214 Wis. 2d at 621 (citation omitted).
¶ 88. The text of the John Doe statute gives the John Doe judge broad powers. Within his discretion, the John Doe judge is able to determine the extent of the investigation and whether the investigation is conducted in secret. Wis. Stat. § 968.26(3).[24] We have long recognized the need for secrecy in John Doe *71 proceedings and have identified several reasons that justify such secrecy. Cummings, 199 Wis. 2d at 736.
These include: (1) keeping knowledge from an unarrested defendant which could encourage escape; (2) preventing the defendant from collecting perjured testimony for the trial; (3) preventing those interested in thwarting the inquiry from tampering with prosecutive testimony or secreting evidence; (4) rendering witnesses more free in their disclosures; and (5) preventing testimony which may be mistaken or untrue or irrelevant from becoming public.
Id. These reasons illustrate how important a John Doe proceeding can be as an investigative tool. The secrecy orders available to a John Doe proceeding serve to protect the integrity of the investigation.[25] Such orders help encourage witnesses who may be reluctant or fearful to testify by keeping their testimony secret. The secrecy of a John Doe investigation also protects innocent targets of the investigation by preventing the *72 disclosure of "testimony which may be mistaken or untrue." Id.
¶ 89. Consistent with this broad authority," [t]he John Doe judge should act with a view toward issuing a complaint or determining that no crime has occurred." Washington, 83 Wis. 2d at 823. Accordingly, the scope of any John Doe investigation "is essentially limited to the subject matter of the complaint upon which the John Doe is commenced." Id. at 822; see also In re Doe, 317 Wis. 2d 364, ¶ 23. "The John Doe judge has no authority to ferret out crime wherever he or she thinks it might exist." Washington, 83 Wis. 2d at 822 (emphasis added). This final limitation is crucial to the fair administration of a John Doe proceeding. Without it, John Doe proceedings could easily devolve into judicially sanctioned general warrants.
¶ 90. The purpose of the Fourth Amendment to the United States Constitution[26] and of Article I, Section 11 of the Wisconsin Constitution[27] "was to abolish searches by general warrants, which autho *73 rized searches in any place or for any thing." State ex rel. City of Milwaukee v. Newman, 96 Wis. 258, 267, 71 N.W. 438 (1897). Such general warrants, also known as Writs of Assistance, "were used in the American colonies to search wherever government officials chose with nearly absolute and unlimited discretion." State v. Tye, 2001 WI 124, ¶ 8, 248 Wis. 2d 530, 636 N.W.2d 473. "These early warrants lacked specificity and allowed government officers in the late eighteenth century to enter homes, shops, and other places, and in the event the officers encountered resistance, they could break down doors and forcibly search closed trunks and chests." In re John Doe Proceeding, 2004 WI 65, ¶ 36, 272 Wis. 2d 208, 680 N.W.2d 792. To combat such unchecked power, the Fourth Amendment requires reasonable searches and mandates that warrants "particularly describ[e] the place to be searched." U.S. Const, amend. IV.
¶ 91. Reasonableness and particularity are not just requirements of search warrants, however. Subpoenas issued by courts, and by extension John Doe judges, must also satisfy these requirements of the Fourth Amendment. In re John Doe Proceeding, 272 Wis. 2d 208, ¶ 38. A John Doe proceeding, with its broad investigatory powers, must never be allowed to become a fishing expedition.
*74 ¶ 92. It is difficult, if not impossible, to overstate the importance of the role of the John Doe judge. If he does not conduct the investigation fairly, as a neutral and detached magistrate, the risk of harm to innocent targets of the investigation-and we remain mindful that all such targets are presumed innocent-is too great. Through the use of a John Doe proceeding, "law enforcement officers are able to obtain the benefit of powers not otherwise available to them, i.e., the power to subpoena witnesses, to take testimony under oath, and to compel the testimony of a reluctant witness." Washington, 83 Wis. 2d at 822-23. Such powers, if not wielded with care and skill may serve to transform a John Doe proceeding into an implement of harassment and persecution by a vengeful or unethical prosecutor. Thus, John Doe judges must be mindful of this danger and zealously guard the rights of all citizens against over-reach.
¶ 93. The foregoing discussion emphasizes that John Doe proceedings are a necessary investigative tool "to 'ascertain whether [a] crime has been committed and by whom.'" Cummings, 199 Wis. 2d at 736 (quoting Wolke v. Fleming, 24 Wis. 2d 606, 613, 129 N.W.2d 841 (1964)). John Doe proceedings have been utilized in Wisconsin since it was a territory and have no doubt served our state well. But the simple fact that the John Doe proceeding has a long and near constant use should not blind us to the potential for abuse. We must be mindful of the purpose of the John Doe proceeding and why it was originally instituted. This purpose was aptly explained by this court more than 125 years ago:
*75 When this statute was first enacted the common-law practice was for the magistrate to issue the warrant on a complaint of mere suspicion, and he was protected in doing so. This was found to be a very unsafe practice. Many arrests were made on groundless suspicion, when the accused were innocent of the crime and there was no testimony whatever against them. The law delights as much in the protection of the innocent as in the punishment of the guilty. This statute was made to protect citizens from arrest and imprisonment on frivolous and groundless suspicion. . . . 'Our statute is framed so as to exclude in a great measure the abuses to which such a practice might lead, and undoubtedly was designed to throw the duty of judging, in this respect, entirely upon the magistrate. It should not regard mere allegations of suspicion, but the grounds of the suspicion-the facts and circumstances-must be laid before him, and these should be sufficient to make it appear that a crime has been actually committed, and that there is probable cause for charging the individual complained of therewith.'
State v. Keyes, 75 Wis. 288, 294-95, 44 N.W. 13 (1889) (citations omitted).
¶ 94. In sum, Wis. Stat. § 968.26 grants John Doe judges broad authority to conduct an investigation into alleged crimes. A John Doe judge is also given "those powers necessary" to carry out this duty. Cummings, 199 Wis. 2d at 736. Nevertheless, "[a]s to all aspects of the conduct of the judicial function, the [John Doe] judge is the governor of the proceedings, and as such is responsible for maintaining the good order, dignity, and insofar as it is compatible with the administration of justice, efficiency of those proceedings." In re Doe, 317 Wis. 2d 364, ¶ 22. This duty applies with equal force in all John Doe proceedings, *76 regardless of the target's station in life, or the crime alleged, be it drug trafficking in the inner city, malfeasance in the corporate boardroom, or corruption in the halls of government.
C. Reserve Judge Peterson Did Not Violate a Plain Legal Duty When He Quashed the Subpoenas and Search Warrants Issued in This Case.
¶ 95. As is clear from the above discussion, John Doe judges are given enormous discretion to control the scope and conduct of a John Doe proceeding. With this important point in mind, we now turn to the specific issue before us: whether Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all seized property. He did not.
¶ 96. "A plain duty 'must be clear and unequivocal and, under the facts, the responsibility to act must be imperative.'" Kalal, 271 Wis. 2d 633, ¶ 22 (quoting Kurkierewicz, 42 Wis. 2d at 377-78). Although a supervisory writ is the proper vehicle for the special prosecutor to seek review of Reserve Judge Peterson's decision, the writ procedure serves a very narrow function which is distinct from the normal appellate process. Id., ¶ 24. The purpose of a supervisory writ is "to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process." Id. (emphasis added).
¶ 97. Here, the special prosecutor argues that Reserve Judge Peterson failed to comply with his duty to correctly apply the law and erroneously concluded *77 that Wisconsin campaign finance law does not regulate the Unnamed Movants' alleged conduct. The special prosecutor essentially argues that Reserve Judge Peterson misapplied the law and prematurely ended the John Doe investigation. This argument misses the point of the supervisory writ procedure and asks us to adopt a standard of review that we explicitly rejected in Kalal. See id., ¶¶ 23-24 ("In essence, the Kalals argue that the judge . . . has a plain duty to correctly find facts and apply the law. We cannot accept this proposition, as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law."). As was the case in Kalal, if we were to adopt the special prosecutor's understanding of a plain legal duty, we "would transform the writ into an all-purpose alternative to the appellate review process." Id., ¶ 24. This we will not do.
¶ 98. A John Doe judge is given the discretion to determine the extent of the investigation. Wis. Stat. § 968.26(3). In doing so, he or she "should act with a view toward issuing a complaint or determining that no crime has occurred." Washington, 83 Wis. 2d at 823. In his decision to quash the subpoenas and search warrants, Reserve Judge Peterson concluded that the subpoenas and search warrants do not provide a reasonable belief that the Unnamed Movants "committed any violations of the campaign finance laws." Reserve Judge Peterson further concluded that "[t]he State is not claiming that any of the independent organizations expressly advocated.[28] Therefore the subpoenas[29] fail *78 to show probable cause that a crime was committed." In a subsequent order granting a stay of his decision to quash, Reserve Judge Peterson clarified that, although he mistakenly phrased his decision in the context of whether the subpoenas showed probable cause, the subpoenas and search warrants were premised "on an invalid interpretation of the law. That. . . was the underlying problem with the subpoenas."[30]
*79 ¶ 99. Reserve Judge Peterson's decision is consistent with his discretion to determine the extent of the John Doe investigation. In addition, "[i]t is within the discretion of the trial court to quash a subpoena." State v. Horn, 126 Wis. 2d 447, 456, 377 N.W.2d 176 (Ct. App. 1985), aff'd, 139 Wis. 2d 473, 407 N.W.2d 854 (1987). Because supervisory writs are not appropriate vehicles to review a judge's discretionary acts, see Kalal, 271 Wis. 2d 633, ¶ 24, the special prosecutor has failed to show that Reserve Judge Peterson violated a plain legal duty by quashing the subpoenas and search warrants. Therefore, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.[31]
*80 V. THREE UNNAMED PETITIONERS
¶ 100. Finally, we turn to Three Unnamed Petitioners, in which the Unnamed Movants appeal an opinion and order of the court of appeals denying their petition for a supervisory writ. This case requires us to determine whether either Reserve Judge Kluka or Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor.[32]
¶ 101. We affirm the decision of the court of appeals and deny the Unnamed Movants' petition for a supervisory writ. We hold that the Unnamed Movants have not met the burden of proof required for a supervisory writ. Specifically, they have not established that either Reserve Judge Kluka or Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor. "The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system." Kalal, 271 Wis. 2d 633, ¶ 24. The Unnamed Movants' argument does not fit the purpose *81 of a supervisory writ, which requires a "clear and unequivocal" duty to act on the part of the judge. Id., ¶ 22. If we were to adopt the Unnamed Movants' argument, we "would transform the writ into an all-purpose alternative to the appellate review process." Id., ¶ 24. Because the Unnamed Movants have not identified a violation of a plain legal duty, their petition for a supervisory writ is denied.
A. Standard of Review
¶ 102. "[T]he authority of both judges and prosecutors in a John Doe proceeding!] • • • are questions of statutory interpretation which this court reviews de novo without deference to the circuit court or court of appeals." Cummings, 199 Wis. 2d at 733. Thus, "[w]hether a John Doe judge has exceeded his or her powers is a question of law that this court determines independently." State ex rel. Individual Subpoenaed to Appear at Waukesha Cnty. v. Davis, 2005 WI 70, ¶ 17, 281 Wis. 2d 431, 697 N.W.2d 803 (citing Cummings, 199 Wis. 2d at 733).
¶ 103. For a supervisory writ to issue, the petitioner for the writ must establish that: "(1) an appeal is an inadequate remedy; (2) grave hardship or irreparable harm will result; (3) the duty of the trial court is plain and it must have acted or intends to act in violation of that duty; and (4) the request for relief is made promptly and speedily." Kalal, 271 Wis. 2d 633, ¶ 17 (emphasis added).
¶ 104. A " 'writ of supervision is not a substitute for an appeal.' " Id. (citation committed). "A supervisory writ 'is considered an extraordinary and drastic remedy that is to be issued only upon some grievous exigency.'" Id. (citation omitted).
*82 ¶ 105. Although a court exercises its discretion in deciding whether or not to issue a writ, "[t]he exercise of that discretion often involves . . . resolving questions of law in order to determine whether the circuit court's duty is plain." State ex rel. Kenneth S. v. Circuit Court for Dane Cnty., 2008 WI App 120, ¶ 9, 313 Wis. 2d 508, 756 N.W.2d 573. "A plain duty 'must be clear and unequivocal and, under the facts, the responsibility to act must be imperative.'" Kalal, 271 Wis. 2d 633, ¶ 22 (citation omitted). The obligation of a judge to correctly find facts and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure, "as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law." Id., ¶ 24; see also supra ¶ 80.
¶ 106. Consequently, for a writ to issue in this case, the Unnamed Movants must demonstrate that the John Doe judges violated a plain legal duty, either in accepting an appointment as a reserve judge, in convening a John Doe proceeding over multiple counties, or in appointing a special prosecutor.
B. The Unnamed Movants Have Failed to Prove the Violation of a Plain Legal Duty.
i. No Violation of a Plain Legal Duty Occurred in the Appointment and Assignment of Reserve Judge Kluka or Reserve Judge Peterson to Preside Over a Multi-County John Doe Proceeding.
¶ 107. We first discuss whether Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty either in accepting an appointment as a reserve judge or in convening a multi-county John Doe pro *83 ceeding. We hold that the Unnamed Movants failed to prove that Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty by accepting an appointment as a reserve judge or in convening a John Doe proceeding over multiple counties.
1. Reserve Judge Kluka Did Not Violate a Plain Legal Duty in Accepting Her Appointment as a Reserve Judge.
¶ 108. We begin our discussion of this issue by explaining the distinction between the appointment and assignment of a reserve judge. A former judge is appointed to be a reserve judge by the Chief Justice. Once a former judge has been appointed to be a reserve judge then that reserve judge can be assigned to a particular case or to a particular circuit court calendar.
¶ 109. The Director of State Courts has the power to assign reserve judges, but he does not have the power to appoint reserve judges. See SCR 70.10[33]; SCR 70.23.[34] The Chief Justice is the sole individual with the power to both appoint and assign reserve *84 judges. See Wis. Const. art. VII, § 24(3)[35]; Wis. Stat. § 753.075[36]; SCR 70.23(1).[37]
¶ 110. The relevant orders in the record state that Reserve Judge Kluka was assigned, not appointed, to serve as the John Doe judge in each of the five counties. Once the Milwaukee County District Attorney's Office filed a petition for the commencement of a John Doe proceeding in Milwaukee County, Chief Judge Kremers "assigned and forwarded" the petition to "Reserve Judge Kluka" on August 23, 2012. There *85 after, on September 5, 2012, the Director of State Courts, with then-Chief Justice Shirley Abrahamson's name directly above, assigned Reserve Judge Kluka to preside over the matter using a form titled "Application and Order for Specific Judicial Assignment." The actions taken by Chief Judge Kremers and the Director of State Courts suggest that Kluka possessed reserve judge status at the time her assignments were made. However, nothing in the record definitively establishes that the then-Chief Justice had previously appointed Kluka as a reserve judge.
¶ 111. The absence of a record on this point is very likely because no one disputes that Kluka was lawfully appointed as a reserve judge. Indeed, the Unnamed Movants do not challenge Reserve Judge Kluka's authority to preside over the Milwaukee County John Doe proceeding. Rather, according to the Unnamed Movants, "the problem arose later, when the Director of State Courts extended that [assignment] to four more counties in one functionally-consolidated proceeding or investigation." In fact, in their reply brief, the Unnamed Movants state "the core issue is not who appointed a reserve judge: it is whether the five-county structure is lawful at all." Because the Unnamed Movants have failed to show that Reserve Judge Kluka was not lawfully appointed, it follows that they have failed to prove that she violated a plain legal duty in accepting her appointment as a reserve judge.
2. Reserve Judge Peterson Did Not Violate a Plain Legal Duty in Accepting His Appointment as a Reserve Judge.
¶ 112. Similarly, the Unnamed Movants also have failed to meet their burden with respect to *86 Reserve Judge Peterson. On October 29, 2013, Chief Judge Kremers assigned Reserve Judge Peterson to serve as the John Doe judge in Milwaukee County, after Reserve Judge Kluka withdrew, in an order titled: "REASSIGNMENT AND EXCHANGE." The document also states: "Reassigned to Reserve Judge Gregory A. Peterson according to the rules." See SCR 70.23 (providing that the chief judge can request the assignment of a reserve judge by the Director of State Courts). As explained above, only the Chief Justice has the authority to appoint reserve judges.
¶ 113. Similar to the issue with Reserve Judge Kluka, the Unnamed Movants do not question Reserve Judge Peterson's authority to preside over the Milwaukee County John Doe proceeding. Their contention is that it was unlawful for Reserve Judge Peterson to accept assignment to four more counties "in one functionally-consolidated proceeding or investigation." Because the Unnamed Movants have failed to show that Reserve Judge Peterson was not lawfully appointed, they have failed to prove that Reserve Judge Peterson violated a plain legal duty in accepting his appointment as a reserve judge.
3. Reserve Judge Kluka Did Not Violate a Plain Legal Duty in Convening a Multi-County John Doe Proceeding.
¶ 114. The Unnamed Movants contend that no one may appoint or assign a reserve judge to serve as a John Doe judge simultaneously in five counties. The Unnamed Movants argue that "the question properly is not whether anything in the enabling statute 'prevents' or 'prohibits' what happened here. The right *87 question is whether anything in the statutes permits what happened here." The Unnamed Movants emphatically state that "[t]he answer to that question is no." However, in examining this issue, we look to whether the John Doe statute clearly prohibits the procedural posture of this John Doe investigation. The answer is no.
¶ 115. Pursuant to Wis. Stat. § 968.26(1)[38] five separate John Doe proceedings were initiated by the district attorneys of the five counties; however, it was for one investigation conducted by a special prosecutor. The investigation was expanded because the initial investigation in Milwaukee County suggested that persons residing in four additional counties could be involved with potential campaign finance violations and Wis. Stat. § 978.05(1) provides that a district attorney shall:
[plrosecute all criminal actions before any court within his or her prosecutorial unit and have sole responsibility for prosecution of all criminal actions arising from violations of chs. 5 to 12 ... that are alleged to be committed by a resident of his or her prosecutorial unit.. . .
See also Wis. Stat. §§ 971.19(11)-(12) (providing that the venue for a criminal proceeding under campaign finance laws shall be the county of the defendant's residence unless the defendant chooses to be tried in the county where the crime occurred). The Director of State Courts, with then-Chief Justice Shirley Abrahamson's name directly above, then executed five sepa *88 rate orders assigning Reserve Judge Kluka to preside over the five separate proceedings. While these five separate proceedings are a single investigation, they have not been consolidated. Rather, the John Doe proceedings at issue have merely been running parallel to one another.
¶ 116. Nothing in the John Doe statute prohibits the initiation of five parallel John Doe proceedings. Put another way, nothing in the John Doe statute explicitly told Reserve Judge Kluka that she could not preside over five John Doe proceedings. To initiate a John Doe proceeding, a district attorney must simply make the request, which is exactly what happened here. See Wis. Stat. § 968.26(1). Because nothing in the John Doe statute expressly prohibits the initiation of five parallel John Doe proceedings concerning a single investigation, we cannot conclude that Reserve Judge Kluka violated a plain legal duty in convening the five separate proceedings. As such, a supervisory writ cannot issue.
¶ 117. The Unnamed Movants argue that they have shown a violation of a plain legal duty. They argue that "[t]he investigation was constituted in direct contravention of Wisconsin statutes and without authority. The John Doe judge . . . had a plain duty to comply with Wisconsin statutes in the conduct of a statutorily-constituted investigation." We rejected an identical argument in Kalal.
¶ 118. In Kalal, a circuit court judge ordered that a criminal complaint be brought against the Kalals under Wis. Stat. § 968.02(3), which allows a circuit judge to order a criminal complaint be issued if a district attorney "refuses" to issue a complaint. Kalal, 271 Wis. 2d 633, ¶¶ 12-13. The Kalals argued that "the circuit judge has a plain duty to correctly deter *89 mine the presence of this threshold refusal before authorizing the issuance of a criminal complaint." Id,., ¶ 23. We held that this argument failed to establish the violation of a plain legal duty. "To the extent that a circuit judge's decision to permit the filing of a complaint under Wis. Stat. § 968.02(3) is legally or factually unsupported, the defendant. . . may seek its dismissal in the circuit court after it has been filed, and may pursue standard appellate remedies thereafter." Id., ¶ 25. "But the statutory prerequisite that the judge find a refusal to prosecute by the district attorney does not impose upon the circuit judge a plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ." Id.
¶ 119. We explained that, "[i]n essence, the Kalals argue that the judge sitting ex parte in a hearing under Wis. Stat. § 968.02(3) has a plain duty to correctly find facts and apply the law." Id., ¶ 23. "We cannot accept this proposition, as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law." Id., ¶ 24. "The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system." Id. "The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts ... [that] fail to fulfill non-discretionary duties . . . ." Id. (citations omitted). "To adopt the Kalals' interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process." Id.
¶ 120. The Unnamed Movants have not identified a "plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ." Id., ¶ 25. In this supervisory writ action, the Unnamed *90 Movants must do more than point out the fact that the statutes do not explicitly authorize the commencement of parallel John Doe proceedings in multiple counties. Further, they must do more than argue that five parallel investigations and proceedings were "implicitly" prohibited by the statute. They must show that by commencing five parallel John Doe proceedings Reserve Judge Kluka violated a plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ. They have not even tried to make such a showing.
¶ 121. We understand the Unnamed Movants' concerns and agree that the kind of multi-county investigation that occurred here does raise serious questions. Typically, statewide or multi-county investigations are conducted by the Attorney General or by the GAB. See Wis. Stat. §§ 165.50(1) (Attorney General), 5.05 (Government Accountability Board). However, Wis. Stat. § 968.26 is silent as to whether a John Doe judge can preside over a multi-county John Doe. It is axiomatic that silence on the point does not (and cannot) result in the creation of a plain legal duty. Here, Reserve Judge Kluka and the special prosecutor initially ran the investigation and proceeding out of a single post office box in Milwaukee controlled by the special prosecutor. They also put the case names and numbers of all five proceedings on every search warrant, subpoena, and order. However, the concerns expressed by the Unnamed Movants are more properly addressed to the legislature, not a court in a supervisory writ petition. Should the legislature wish to prohibit multi-county John Does, it is free to do so. We, however, cannot "transform the writ into an all-purpose alternative to the appellate review process" or *91 announce new rules for future cases as part of that process. Kalal, 271 Wis. 2d 633, ¶ 24. To do so would be an instance of judicial overreach incompatible with the nature and purpose of a supervisory writ.
¶ 122. Therefore, we hold that Reserve Judges Kluka and Peterson did not violate a plain legal duty by: (1) accepting an appointment as a reserve judge; or (2) convening a multi-county John Doe proceeding, and thus we deny the Unnamed Movants' petition for a supervisory writ.
ii. Reserve Judge Kluka Did Not Violate a Plain Legal Duty by Appointing Francis Schmitz to be the Special Prosecutor.
¶ 123. We now turn to whether Reserve Judge Kluka violated a plain legal duty in appointing the special prosecutor, and if so, what effect that would have on the court and special prosecutor's competency. We conclude that the Unnamed Movants have failed to prove that Reserve Judge Kluka violated a plain legal duty in appointing the special prosecutor.
1. Under Carlson, Reserve Judge Kluka Reasonably Concluded that She Had the Authority to Appoint the Special Prosecutor on Her Own Motion.
¶ 124. In appointing the special prosecutor Reserve Judge Kluka relied, in part, on Carlson.[39] Carlson concerned a court's statutory authority to appoint *92 a special prosecutor under Wis. Stat. § 978.045.[40] In Carlson, the court of appeals explained that the plain *93 language of the special prosecutors statute "authorizes two distinct ways in which a court may appoint a special prosecutor." Carlson, 250 Wis. 2d 562, ¶ 8. The first is on the court's own motion. Id. The second is at the request of a district attorney. Id. Where the appointment is on the court's own motion, the court of appeals interpreted Wis. Stat. § 978.045(lr) as giving a court "unfettered authority" to make the appointment, as long as the court entered an order "stating the cause therefor." Id., ¶¶ 5, 9 (quotation omitted) ("In short, if a court makes a special prosecutor appointment on its own motion, it is constrained only in that it must enter an order in the record stating the cause for the appointment."). "[A]ny restriction, if one exists, is triggered only when the appointment is made at the request of a district attorney, not when the appointment is made by a court on its own motion." Id., ¶ 8.
*94 ¶ 125. Carlson thus concluded that a court need satisfy only one of the nine conditions listed under Wis. Stat. § 978.045(lr) when the district attorney requests the appointment of a special prosecutor, but when the court makes the appointment on its own motion, it need only enter an order stating the cause therefor. "A plain reading of the statute tells us that when a court makes this appointment on its own motion, all that is required of the court is that it enter an order in the record 'stating the cause therefor.'" Id., ¶ 9 (quoting Wis. Stat. § 978.045(lr) (1999-2000) which addresses, in part, John Doe proceedings and a John Doe judge's ability to appoint a special prosecutor for such proceedings).
1 126. Reserve Judge Kluka relied on Carlson to appoint, on her own motion, the special prosecutor. Thus, in order to justify the appointment under Carlson, Reserve Judge Kluka was simply required to enter an order "stating the cause therefor," which is exactly what she did in citing concerns of efficiency and the appearance of impropriety.
¶ 127. We note that Carlson is problematic to the point of being suspect. This is so because Carlson disregards the fact that one of the nine conditions enumerated under Wis. Stat. § 978.045(lr) must exist for the appointment of a special prosecutor, regardless of whether the appointment is made on the court's own motion or at the district attorney's request. The Carlson court's failure to import this language from the governing statute is an inexplicable-and very likely fatal-defect in its holding. While we agree with the Unnamed Movants' interpretation of Wis. Stat. § 978.045, we do not take the ultimate step of overruling Carlson because to do so would go further than the *95 supervisory writ allows.[41] Simply put, despite Carlson's questionable validity we cannot reasonably conclude that Reserve Judge Kluka violated a plain legal duty in making the appointment.
¶ 128. The issue presented also asks whether Reserve Judge Kluka violated a plain legal duty in making the special prosecutor appointment where no charges have yet been issued; where the district attorney in each county has not refused to continue the investigation or prosecution of any potential charge; and where no certification that no other prosecutorial unit was able to do the work for which the special prosecutor was sought was made to the Department of Administration. Again, Carlson gave the John Doe judge "unfettered authority" to appoint the special prosecutor, so the absence of these additional circumstances does not demonstrate that Reserve Judge Kluka violated a plain legal duty in making the appointment.
2. Reserve Judge Kluka Also Relied on Her Inherent Authority in Appointing the Special Prosecutor.
I 129. Reserve Judge Kluka also stated that she appointed the special prosecutor pursuant to her "inherent authority" under Cummings. The relevant is *96 sue in Cummings was whether a John Doe judge has the ability to seal a search warrant. Id. at 733. There the defendant argued that no statutory authority conferred such power on John Doe judges. In rejecting the defendant's argument, we reasoned:
[A] John Doe judge has been granted jurisdiction, the legal right to exercise its authority, pursuant to Wis. Stat. § 968.27. A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate. The statutory jurisdiction of a John Doe judge has been defined as the authority of the judge to conduct a John Doe investigation [in order to ascertain whether a crime has been committed and by whom]. .. . The ability to seal a search warrant is exactly that type of power which a John Doe judge needs to fulfill [that] jurisdictional mandate.
Id. at 736-37. Thus, while Cummings did not specifically address a John Doe judge's inherent authority to appoint a special prosecutor, it provides broad language supporting the idea that a John Doe judge possesses inherent authority where it is necessary to facilitate its jurisdictional mandate. Stated otherwise, a John Doe judge's inherent authority is limited to what is necessary to enable the judge to properly conduct a John Doe proceeding. State ex rel. Individual Subpoenaed, 281 Wis. 2d 431, ¶ 26; see In re John Doe Proceeding, 272 Wis. 2d 208, ¶ 10.
¶ 130. The Unnamed Movants argue that the only cases invoking a court's inherent authority to appoint a special prosecutor have arisen after charges have been filed. See, e.g., State v. Lloyd, 104 Wis. 2d 49, 56-57, 310 N.W.2d 617 (Ct. App. 1981). We agree, but that is because no court has addressed whether a John Doe judge has inherent authority to appoint a special prosecutor, which necessarily occurs before charging. *97 That there is an absence of case law addressing whether a John Doe judge has inherent authority to appoint a special prosecutor does not necessarily mean the John Doe judge in this case violated a plain legal duty in doing so.[42]
¶ 131. Arguably, the broad language in Cummings could be used to support Reserve Judge Kluka's actions in this case. Because no law expressly prohibits a John Doe judge from exercising his inherent authority to appoint a special prosecutor, the Unnamed Movants cannot prove that Reserve Judge Kluka violated a plain legal duty in exercising that authority to appoint the special prosecutor.
¶ 132. Due to the existing precedent, Reserve Judge Kluka's legal duty was not plain, clear, and unequivocal with an imperative responsibility to act under the facts. Because the Unnamed Movants have not established that Reserve Judge Kluka violated a plain legal duty in appointing the special prosecutor, we deny their petition for a supervisory writ and affirm the court of appeals.[43]
VI. CONCLUSION
¶ 133. Our lengthy discussion of these three cases can be distilled into a few simple, but important, points. It is utterly clear that the special prosecutor has employed theories of law that do not exist in order to investigate citizens who were wholly innocent of any *98 wrongdoing. In other words, the special prosecutor was the instigator of a "perfect storm" of wrongs that was visited upon the innocent Unnamed Movants and those who dared to associate with them. It is fortunate, indeed, for every other citizen of this great State who is interested in the protection of fundamental liberties that the special prosecutor chose as his targets innocent citizens who had both the will and the means to fight the unlimited resources of an unjust prosecution. Further, these brave individuals played a crucial role in presenting this court with an opportunity to re-endorse its commitment to upholding the fundamental right of each and every citizen to engage in lawful political activity and to do so free from the fear of the tyrannical retribution of arbitrary or capricious governmental prosecution. Let one point be clear: our conclusion today ends this unconstitutional John Doe investigation.
A.
¶ 134. In Two Unnamed Petitioners, we hold that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague under the First Amendment to the United States Constitution and Article I, Section 3 of the Wisconsin Constitution because its language " 'is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate.' " Janssen, 219 Wis. 2d at 374 (quoting Bachowski, 139 Wis. 2d at 411). However, a readily available limiting construction exists that we will apply and that will prevent the chilling of otherwise protected speech; namely, that "political purposes" is limited to express advocacy and its functional equivalent as those terms are defined in Buckley and WRTLII. With *99 this limiting construction in place, Chapter 11 does not proscribe any of the alleged conduct of any of the Unnamed Movants. The special prosecutor has not alleged any express advocacy, and issue advocacy, whether coordinated or not, is "beyond the reach of [Ch. 11]." Barland II, 751 F.3d at 815. Accordingly, we invalidate the special prosecutor's theory of the case, and we grant the relief requested by the Unnamed Movants.
¶ 135. To be clear, this conclusion ends the John Doe investigation because the special prosecutor's legal theory is unsupported in either reason or law. Consequently, the investigation is closed. Consistent with our decision and the order entered by Reserve Judge Peterson, we order that the special prosecutor and the district attorneys involved in this investigation must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the investigation. All Unnamed Movants are relieved of any duty to cooperate further with the investigation.
B.
¶ 136. In Schmitz v. Peterson, we hold that the special prosecutor has failed to prove that Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all property seized by the special prosecutor. In quashing the subpoenas and search warrants, Reserve Judge Peterson exercised his discretion under the John Doe statute, Wis. Stat. § 968.26, to determine the extent of the investigation. Because the purpose of a supervisory writ does not include review *100 of a judge's discretionary acts, Kalal, 271 Wis. 2d 633, ¶ 24, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.
C.
¶ 137. Finally, in Three Unnamed Petitioners, we hold that the Unnamed Movants have failed to prove that either Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor. Although the circumstances surrounding the formation of the John Doe investigation raise serious concerns, and the appointment of the special prosecutor may well have been improper, such concerns do not satisfy the stringent standards of a supervisory writ. Put another way, if we were to grant the supervisory writ in this case, we would risk "transforming] the writ into an all-purpose alternative to the appellate review process," which we cannot do. Id. Accordingly, we deny the supervisory writ and affirm the decision of the court of appeals.
By the Court. — Declaration of rights; relief granted; John Doe investigation ordered closed in Two Unnamed Petitioners.
By the Court. — Petition for supervisory writ denied and order affirmed in Schmitz v. Peterson.
By the Court. — Petition for supervisory writ denied and decision affirmed in Three Unnamed Petitioners.
I 138. ANN WALSH BRADLEY, J., did not participate.

 We have granted the amicus briefs on the merits filed by: Wisconsin Right to Life; Citizens for Responsible Government Advocates, Inc.; The Wisconsin Government Accountability Board; The Honorable Bradley A. Smith, Center for Competitive Politics, and Wisconsin Family Action; Campaign Legal Center, Democracy 21, Common Cause in Wisconsin, and League of Women Voters of Wisconsin; Former Federal Elec *26 tion Commission Members Lee Ann Elliott, David Mason, Hans von Spakovsky, and Darryl Wold; and Wyoming Liberty Group.

 All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

 In our December 16, 2014, grant order we consolidated the cases for the purpose of briefing and oral argument. We subsequently consolidated these three cases into one opinion because each case arises out of the same facts.

 Express advocacy is a communication that expressly advocates for the election or defeat of a clearly identified candidate.

 This is issue seven from our December 16, 2014, grant order.

 This is issue ten from our December 16, 2014, grant order.

 These are issues one through five from our December 16, 2014, grant order.

 See Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶ 23 n.9, 358 Wis. 2d 1, 851 N.W.2d 337, reconsideration denied, 2015 WI 1, 360 Wis. 2d 178, 857 N.W.2d 620 (concluding that the freedom of speech rights protected under the Wisconsin and United States Constitutions are coextensive.) See also Kenosha Co. v. C&S Management, Inc., 223 Wis. 2d 373, 389, 588 N.W.2d 236 (1999).

 The functional equivalent of express advocacy occurs when the " 'ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.'" Wis. Right to Life, Inc. v. Barland, 751 F.3d 804, 820 (7th Cir. 2014) (BarlandII) (citing Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 469-70 (2007) (WRTL II).

 See infra Section V.

 In setting forth the facts, we respect the terms of the secrecy order issued by Reserve Judge Kluka and thus our majority opinion will set forth only the facts necessary for our resolution of this case. See State ex rel. Niedziejko v. Coffey, 22 Wis. 2d 392, 398, 126 N.W.2d 96 (1964). However, we can interpret the secrecy order and modify it to the extent necessary for the public to understand our decision herein. If a fact is necessary to include in order to render explicable a justice's analysis of an issue presented, it is not precluded by the secrecy order. We do not discuss the identity of the Unnamed Movants or the specific allegations against them. We do, however, discuss the actions of the prosecutors and the judges involved.

 We recognize that in the ordinary case our procedural background would not be given with such exacting precision. *33 Conversely, we recognize that in the ordinary case without a secrecy order, our factual background would be more precise, in that we would, among other things, identify the parties. Be that as it may, in the interest of as much transparency as possible we set forth as many of the facts as we can.

 Records from John Doe I have been released to the public by the original John Doe judge and are no longer subject to any secrecy order.

 The actual text of the assignment orders read: "Shirley Abrahamson Chief Justice By: Electronically signed by [sic] A. John Voelker, Director of State Courts."

 "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction." Wis. Const, art. VII, § 3(2).
"The supreme court limits its exercise of original jurisdiction to exceptional cases in which a judgment by the court significantly affects the community at large." Wis. Prof'l Police Ass'n v. Lightbourn, 2001 WI 59, ¶ 4, 243 Wis. 2d 512, 627 N.W.2d 807. We exercised original jurisdiction because this case meets that test.

 The First Amendment is applicable to the States through the Fourteenth Amendment.

 See generally Borland II, 751 F.3d 804.

 Quid pro quo is a Latin term meaning "what for whom" and is defined as "[a]n action or thing that is exchanged for another action or thing of more or less equal value." Black's Law Dictionary 1367 (9th ed. 2009).

 "The problems of vagueness and overbreadth in statutes, although raising separate problems, often arise together." State v. Princess Cinema of Milwaukee, Inc., 96 Wis. 2d 646, 656-57, 292 N.W.2d 807 (1980). "Where statutes have an overbroad sweep, just as where they are vague, 'the hazard of loss or substantial impairment of those precious [First Amendment] rights may be critical,' since those covered by the statute are bound to limit their behavior to that which is unquestionably safe." Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 609 (1967) (internal citation omitted).

 The original complaint initiating John Doe II alleged only coordinated fundraising between the Unnamed Movants. Over time, the theory of coordination evolved to include coordinated issue advocacy.

 Adopting a limiting construction is the only feasible option because the statutory definition of "political purposes" is not severable and because simply declaring the definition unconstitutional without adopting a limiting construction would effectively eliminate all of Wis. Stat. Ch. 11 .

 Although Barland II did not involve an allegation of coordination, that distinction is meaningless in determining whether the definition of "political purposes" is vague or overbroad. It may well be that the distinction between issue and express advocacy is little more than "a line in the sand drawn on a windy day." WRTL II, 551 U.S. at 499 (Scalia, J., concurring) (citation omitted). However, " '[protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse.'" Id. at 475 (majority opinion) (quoting Ashcroft v. Free Speech Coal., 535 U.S. 234, 255 (2002)).

 We note that in Wis. Coal, for Voter Participation, Inc. v. State Elections Bd., 231 Wis. 2d 670, 605 N.W.2d 654 (Ct. App. 1999) (WCVP), the court of appeals concluded that conduct substantially identical to the subject of this investigation, coordinated issue advocacy, is regulated under Wisconsin law. The key language from that case upon which the special prosecutor's theories rest, is that "the term 'political purposes' is not restricted by the cases, the statutes or the code to acts of express advocacy. It encompasses many acts undertaken to influence a candidate's election. ..." WCVP, 231 Wis. 2d at 680.
The court of appeals' statement regarding "political purposes" is incorrect. It was incorrect when WCVP was decided in 1999, and it is incorrect today. Just four months prior to the WCVP decision, this court stated that
Buckley stands for the proposition that it is unconstitutional to place reporting or disclosure requirements on communications which do not 'expressly advocate the election or defeat of a clearly identified candidate.1 Any standard of express advocacy must be consistent with this principle in order to avoid invalidation on grounds of vagueness and/or overbreadth.
Elections Bd. of State of Wis. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 669, 597 N.W.2d 721 (1999) (WMC) (citations omitted). This should have been enough to "restrict" the definition of "political purposes" in Chapter 11. If "it is unconstitutional to place reporting or disclosure requirements on communications which do not 'expressly advocate the election or defeat of a clearly identified candidate,'" then "political purposes" cannot extend as broadly as WCVP and the special prosecutor claim. At the very least, WCVP ignores WMC and is inconsistent with its explanation of Buckley.
In any event, even assuming that it was good law to begin with, WCVP is no longer a correct interpretation of "political purposes" in Chapter 11. As discussed above, recent case law has clearly restricted the scope of permissible regulation in campaign finance law to express advocacy and its functional equivalent. See WRTL II, 551 U.S. 449; Citizens United v. Fed. *61 Election Comm'n, 558 U.S. 310 (2010); Borland II, 751 F.3d 804. Therefore, to the extent that WCVP implies that the definition of "political purposes" in Chapter 11 extends beyond express advocacy and its functional equivalent, WCVP is overruled.

 The full text of this subsection is:
The extent to which the judge may proceed in an examination under sub. (1) or (2) is within the judge's discretion. The examination may be adjourned and may be secret. Any witness exam-
*71 ined under this section may have counsel present at the examination but the counsel shall not be allowed to examine his or her client, cross-examine other witnesses, or argue before the judge. Subject to s. 971.23, if the proceeding is secret, the record of the proceeding and the testimony taken shall not be open to inspection by anyone except the district attorney unless it is used by the prosecution at the preliminary hearing or the trial of the accused and then only to the extent that it is so used. A court, on the motion of a district attorney, may compel a person to testify or produce evidence under s. 972.08 (1). The person is immune from prosecution as provided in s. 972.08 (1), subject to the restrictions under s. 972.085.
Wis. Stat. § 968.26(3).

 We do not disregard the secrecy order issued in the John Doe proceeding. See Niedziejko, 22 Wis. 2d at 398. However, we interpret and modify the secrecy order to the extent necessary for the public to understand our decision herein. Consequently, *72 if a fact is necessary to include in order to render explicable a justice's analysis of an issue presented, it is not precluded by the secrecy order.

 The Fourth Amendment provides that
[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV.

 Article I, Section 11 provides that
*73 [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
Wis. Const, art. I, § 11.

 The special prosecutor now claims that coordinated express advocacy did in fact occur between Unnamed Movants *78 I and 6 and two express advocacy groups, neither of which are parties to the current lawsuits. The special prosecutor and the Unnamed Movants presented Reserve Judge Peterson with the evidence of coordination regarding the first express advocacy group. Reserve Judge Peterson considered this evidence when deciding whether or not to quash the subpoenas or order the return of seized property. Reserve Judge Peterson definitively concluded that "[t]here is no evidence of express advocacy." We will not disturb that decision as, under the John Doe statute, it was Reserve Judge Peterson's to make. More fundamentally, however, as a member of the first express advocacy group, the candidate at issue in this case and his agents had an absolute constitutional right to interact with a political organization of which he was a member, and improper coordination cannot be presumed by such contacts. Colo. Republican Fed. Campaign Comm. v. Fed. Eletion. Comm'n, 518 U.S. 604, 619 (1996). Further, the special prosecutor chose not to present evidence pertaining to the second express advocacy group to Reserve Judge Peterson. Arguments not presented to the court in the first instance are deemed waived. State v. Caban, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997).

 Although he refers only to the subpoenas issued in the John Doe investigation, Reserve Judge Peterson later clarified that "for the reasons stated above regarding the limitations on the scope of the campaign finance laws, I conclude that the . . . warrants [issued for Unnamed Movants Nos. 6 and 7] lack probable cause."

 We note that as a result of our interpretation of Chapter II in Two Unnamed Petitioners, Reserve Judge Peterson's interpretation is correct as a matter of law.

 While we base our conclusion solely on Reserve Judge Peterson's exercise of discretion under the John Doe statute, we note that there are serious flaws with the subpoenas and search warrants, which were originally issued by Reserve Judge KLuka. As we explained above, a John Doe judge does not act as "chief investigator" or as a mere arm of the prosecutor. State v. Washington, 83 Wis. 2d 808, 823, 266 N.W.2d 597 (1978). Rather, a John Doe judge serves as a check on the prosecutor and on the complainant to ensure that the subject(s) of the investigation receive(s) due process of law. See State v. Doe, 78 Wis. 2d 161, 164-65, 254 N.W.2d 210 (1977). This is an important function that cannot be ignored. Judges cannot simply assume that the prosecutor is always well-intentioned. Due to the exceptionally broad nature of the subpoenas and search warrants, it is doubtful that they should have ever been issued in the first instance.
The special prosecutor alleges that the Unnamed Movants engaged in "illegal" coordination of issue advocacy sometime between 2011 and 2012. The subpoenas and search warrants, however, sought records-many of which were personal and had nothing to do with political activity-and information ranging from 2009 through 2013. If the illegal conduct took place during a discrete timeframe in 2011 and 2012, as the special prosecutor *80 alleges, what possible relevance could documents from a full two years prior have to the crime alleged? By authorizing such sweeping subpoenas and search warrants, Reserve Judge Kluka failed in her duty to limit the scope of the investigation to the subject matter of the complaint. See In re Doe, 2009 WI 46, ¶ 23, 317 Wis. 2d 364, 766 N.W.2d 542. These subpoenas and search warrants also come dangerously close to being general warrants of the kind which, in part, provoked our forefathers to separate from the rule of Empire.

 This case presents issues one through five in our December 16, 2014 grant order. See supra ¶ 9.

 "The director of state courts shall have the responsibility and authority regarding the assignment of reserve judges and the interdistrict assignment of active judges at the circuit court level where necessary to the ordered and timely disposition of the business of the court."

 "The director of state courts may make interdistrict judicial assignments at the circuit court level." SCR 70.23(1). "The director of state courts may also make a permanent assignment to a judicial district of a reserve judge who can be assigned by a chief judge in the same manner as an active circuit judge under this section." SCR 70.23(2). "[I]f the chief judge deems it necessary the chief judge shall call upon the *84 director of state courts to assign a judge from outside the judicial administrative district or a reserve judge." SCR 70.23(4).

 "A person who has served as a supreme court justice or judge of a court of record may, as provided by law, serve as a judge of any court of record except the supreme court on a temporary basis if assigned by the chief justice of the supreme court."

 (l)Definitions. In this section:
(a) 'Permanent reserve judge' means a judge appointed by the chief justice to serve an assignment for a period of 6 months. Permanent reserve judges shall perform the same duties as other judges and may be reappointed for subsequent periods.
(b) 'Temporary reserve judge1 means a judge appointed by the chief justice to serve such specified duties on a day-by-day basis as the chief justice may direct.
(2) Eligibility. The chief justice of the supreme court may appoint any of the following as a reserve judge:
(a) Any person who has served a total of 6 or more years as a supreme court justice, a court of appeals judge or a circuit judge.
(b) Any person who was eligible to serve as a reserve judge before May 1, 1992.

 "The chief justice may assign active or reserve judges, other than municipal judges, to serve temporarily in any court or branch of a circuit court for such purposes and period of time as the chief justice determines to be necessary."

 "If a district attorney requests a judge to convene a proceeding to determine whether a crime has been committed in the court's jurisdiction, the judge shall convene a proceeding described under sub. (3) and shall subpoena and examine any witnesses the district attorney identifies."

 To be clear, we do not rely on State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 563. There are certainly distinctions to be made between the facts of Carlson and the facts of the instant case. We discuss Carlson only as it relates *92 to the larger question of whether Reserve Judge Kluka violated a plain legal duty at the time the appointment was made.

 Wisconsin Stat. § 978.045, the "special prosecutors" statute, provides:
(lg) A court on its own motion may appoint a special prosecutor under sub. (lr) or a district attorney may request a court to appoint a special prosecutor under that subsection. Before a court appoints a special prosecutor on its own motion or at the request of a district attorney for an appointment that exceeds 6 hours per case, the court or district attorney shall request assistance from a district attorney, deputy district attorney or assistant district attorney from other prosecutorial units or an assistant attorney general. A district attorney requesting the appointment of a special prosecutor, or a court if the court is appointing a special prosecutor on its own motion, shall notify the department of administration, on a form provided by that department, of the district attorney's or the court's inability to obtain assistance from another prosecutorial unit or from an assistant attorney general.
(lr) Any judge of a court of record, by an order entered in the record stating the cause for it, may appoint an attorney as a special prosecutor to perform, for the time being, or for the trial of the accused person, the duties of the district attorney. An attorney appointed under this subsection shall have all of the powers of the district attorney. The judge may appoint an attorney as a special prosecutor at the request of a district attorney to assist the district attorney in the prosecution of persons charged with a crime, in grand jury proceedings or John Doe proceedings under s. 968.26, in proceedings under ch. 980, or in investigations. The judge may appoint an attorney as a special prosecutor if any of the following conditions exists:
(a) There is no district attorney for the county.
(b) The district attorney is absent from the county
(c) The district attorney has acted as the attorney for a party accused in relation to the matter of which the accused stands charged and for which the accused is to be tried.
*93 (d) The district attorney is near of kin to the party to be tried on a criminal charge.
(e) The district attorney is physically unable to attend to his or her duties or has a mental incapacity that impairs his or her ability to substantially perform his or her duties.
(f) The district attorney is serving in the U.S. armed forces.
(g) The district attorney stands charged with a crime and the governor has not acted under s. 17.11.
(h)The district attorney determines that a conflict of interest exists regarding the district attorney or the district attorney staff.
(i) Ajudge determines that a complaint received under s. 968.26 (2) (am) relates to the conduct of the district attorney to whom the judge otherwise would refer the complaint.

 The procedural posture of this case prevents us from overruling Carlson. If this issue were to arise in a non-supervisory writ case we may very well overrule Carlson. However, the supervisory writ is not an "all-purpose alternative to the appellate review process." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶ 24, 271 Wis. 2d 633, 681 N.W.2d 110.

 While we do not endorse Reserve Judge Kluka's interpretation of her inherent authority in this instance, we cannot say her conduct of appointing a special prosecutor was violative of a plain legal duty.

 We need not address what effect an unlawful appointment would have had because no violation of a plain legal duty occurred.